JUDGE DANIELS

Kenneth A. Goldberg, Esq.
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3520
New York, New York 10165
(212) 983-1077
Attorneys For The Plaintiff

14 CV 7746

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JIL MAZER-MARINO, BANKRUPTCY TRUSTEE, ON BEHALF OF THE ESTATE OF NOE MATOS,

Plaintiff,

- against -

NY CAP AGENCY LLC, OGDEN CAP PROPERTIES, LLC, AND GLORIA MILSTEIN FLANZER,

Defendants.

**COMPLAINT AND JURY DEMAND**

**JURY TRIAL DEMANDED**

RECEIVED
SEP 24 2014
U.S.D.C. S.D.N.Y.

## NATURE OF THE ACTION AND THE PARTIES

1. This case is about an employee that was fired the day after he advised his boss that he was undergoing surgery and needed a reasonable accommodation for his condition.

2. This is an action to redress unlawful discrimination and discharge based on disability, under the New York City Human Rights Law, as amended (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq., the Americans with Disabilities Act, as amended (the "ADA"), 42 U.S.C. § 12101 et seq.; and the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. L. § 290 et seq.

3. Plaintiff Jil Mazer-Marino is the Chapter 7 trustee for Noe Matos, who filed a petition for relief with the United States Bankruptcy Court for the Southern District of New York, Case No. 14-11263 (the "Chapter 7 BR Case").

4. Noe Matos ("Mr. Matos" or "Debtor") is a former employee of Defendants and, prior to the commencement of his Chapter 7 BR Case, was pursuing various legal claims against Defendants, which claims are now the property of the estate in the Chapter 7 BR Case. At all relevant times, Mr. Matos was a resident of New York City and, specifically, Manhattan.

5. Upon information and belief, NY Cap Agency LLC and Ogden CAP Properties, LLC ("Corporate Defendants") are legal entities doing business in New York, New York.

6. Upon information and belief, Corporate Defendants each have a principal place of business in New York, New York.

7. Upon information and belief, Defendant Gloria Milstein Flanzer ("Mrs. Flanzer") is an adult female, residing in New York.

8. All Defendants are individually and collectively referred to herein as "Defendants" and the "Company."

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over Plaintiff's ADA claims based on 42 U.S.C. §§ 12117(a), 2000e-5(f), 2000e-5(g), 1981a and 28 U.S.C. §§ 1331, 1343 and 2201.

10. The Court has supplemental jurisdiction over Plaintiff's NYCHRL and NYSHRL claims, based on 28 U.S.C. § 1367(a).

11. Venue is proper in this district based on 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

12. In July 2012, Mr. Matos filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

13. On or about March 20, 2014, the EEOC issued a Determination in Mr. Matos's favor.

14. On or about June 30, 2014, the EEOC issued a notice of right to sue to Mr. Matos, which he received thereafter.

15. Plaintiff filed this lawsuit in a timely fashion and satisfied all of the statutory prerequisites to filing same.

**FACTS**

16. Mr. Matos was employed by Defendants for about two years, providing services as a personal chauffeur/houseman ("Chauffeur") for Mrs. Flanzer, who was Mr. Matos's boss.

17. Prior to his employment with Defendants, Mr. Matos had a successful career as a personal chauffeur for the Goldstein family (SDG Management) in New York City.

18. In May 2010, Mr. Matos was contacted by Roslyn Gersten to interview for the position of Chauffeur for Mrs. Flanzer.

19. Mr. Matos met with Mrs. Gersten.

20. Thereafter, Mr. Matos interviewed with Mrs. Flanzer at her residence at 3 Brookfield Lane Scarsdale, New York (the "Scarsdale Residence").

21. During that meeting, Mrs. Flanzer hired Mr. Matos.

22. Mrs. Flanzer also made various comments to Mr. Matos.

23. Mrs. Flanzer told Mr. Matos she was impressed with his 13 years of service to the Goldstein family.

24. Mrs. Flanzer told Mr. Matos her prior chauffeur was employed for five years.

25. Mr. Matos later learned that Mrs. Flanzer's prior chauffeur was not employed for five years. Upon information and belief, Mrs. Flanzer had hired and fired about seven prior chauffeurs, whose employment was not long lasting.

26. Mrs. Flanzer advised Mr. Matos that she spends six months a year in New York and when she is in New York, he will work as her personal chauffeur.

27. Mrs. Flanzer advised Mr. Matos that she spends six months a year in Florida and when she is Florida, he will have various duties in New York, including: (a) helping her maid with household duties and running errands, etc.; (b) cleaning and organizing the basement; (c) cleaning and organizing the attic, vacuuming and cleaning the house and garage; (d) painting her deck; (e) watering plants; and (f) cleaning all windows in and out of the home.

28. At all times, Mr. Matos was fully qualified for his position and performed well.

29. When Mrs. Flanzer was in New York, Mr. Matos worked as her chauffeur and regularly chauffeured Mrs. Flanzer (and her husband Louis Flanzer, now deceased) to and from New York City, specifically, Manhattan, and accompanied Mrs. Flanzer (and Mr. Flanzer), to

social events, to dining, to medical appointments, to visit her apartments at One Lincoln Plaza, Manhattan, and for other matters in New York City.

30. Mr. Matos also helped Mrs. Flanzer with shopping, including among other items at Bed Bath and Beyond, Lord & Taylor, food shopping, and elsewhere.

31. In addition, Mr. Matos performed other duties.

32. For example, Mr. Matos served as a houseman and answered the front door.

33. For example, Mr. Matos greeted guests and when various contractors came to the Scarsdale Residence, Mr. Matos showed them where work needed to be done and followed up.

34. In addition, Mr. Matos performed other tasks at the Scarsdale Residence ("Chores"), including without limitation:

* Mr. Matos cleaned and organized the basement.
* Mr. Matos scrubbed floors and cleaned toilets.
* Mr. Matos vacuumed.
* Mr. Matos sent faxes for Mrs. Flanzer.
* Mr. Matos answered the phone at the Scarsdale Residence.
* Mr. Matos watered plants
* Mr. Matos washed the car.
* Mr. Matos cleaned and organized the garage.
* Mr. Matos moved furniture.
* Mr. Matos cleaned/polished windows, chandeliers, stairs, and furniture.
* Mr. Matos cleaned/mopped the basement when it was flooded.

35. In addition, when Mrs. Flanzer and her husband Louis Flanzer (now deceased) were in New York, Mr. Matos personally took great care of Mr. Flanzer.

36. When Mr. Flanzer was ill, Mr. Matos carried him to his bedroom and helped Mr. Flanzer change into his pajamas. When Mr. Flanzer needed to get to the hospital, Mr. Matos

carried him to the car, chauffeured him to the hospital, and physically carried him into the hospital. Mrs. Flanzer knew that Mr. Matos was providing such care.

37. When Mrs. Flanzer was in Florida, Mr. Matos continued to work on a full time basis in New York and there was no shortage of work, duties and tasks for Mr. Matos to perform.

38. For example, on a weekly basis, Mr. Matos chauffeured the maid to Mrs. Flanzer's apartments at One Lincoln Plaza, Manhattan, and helped the maid clean them.

39. When Mrs. Flanzer was in Florida, Mr. Matos continued to perform the Chores.

40. When Mrs. Flanzer was in Florida, Mr. Matos performed numerous additional duties and tasks for Mrs. Flanzer, including:

* Mr. Matos cleaned and painted the deck.
* Mr. Matos shampooed the rug in Mrs. Flanzer's bedroom.
* Mr. Matos drove to Federal Express to send packages to Mrs. Flanzer in Florida and to pick up packages addressed to her.
* Mr. Matos forwarded mail to Mrs. Flanzer in Florida.
* Mr. Matos shoveled snow to clear the driveway and house entrance.

41. When Mrs. Flanzer was in Florida, she contacted Mr. Matos regularly and instructed him to perform various other assignments, including without limitation:

* Mr. Matos chauffeured Mrs. Flanzer's friends Nola & Harold to and from medical appointments with their doctors.
* Mr. Matos drove to the home of her friends Roslyn and Jerry Gersten and helped them to pack their car for a road trip to Florida.

42. On or about February 8, 2012, Mr. Matos called Mrs. Flanzer (then in Florida) and advised her that Mr. Matos was having extreme knee pain, which was causing him to limp.

43. Mrs. Flanzer was clearly displeased about and resented Mr. Matos's medical condition, because she wanted him to work.

44. Mrs. Flanzer told Mr. Matos to go to White Plains Hospital, Flanzer Pavilion emergency room, for treatment, and told him to identify her as his employer.

45. On or about February 8, 2012, Mr. Matos went to the hospital.

46. At the hospital, Dr. Benjamin Brown examined Mr. Matos, diagnosed a torn ligament, put a knee brace on him and gave him a cane to use, and prescribed pain medication.

47. Mr. Matos called Mrs. Flanzer from the hospital.

48. Mr. Matos and/or Dr. Brown advised Mrs. Flanzer of Mr. Matos's condition.

49. Mrs. Flanzer was advised that Mr. Matos would be seeing additional doctors.

50. Mr. Matos saw additional doctors and was referred to a specialist for an MRI.

51. On or about February 15, 2012, Mr. Matos underwent an MRI.

52. The MRI resulted in a diagnosis of a torn Meniscus, which required surgery.

53. The surgery was scheduled for March 22, 2012.

54. On March 12, 2012, Mr. Matos called Mrs Flanzer, then in Florida.

55. Mr. Matos told Mrs. Flanzer that he (a) would undergo necessary knee arthroscopy/surgery on March 22, 2012, (b) would require 1-2 weeks of time off for the surgery and recovery, and (c) would then return to work and require some ongoing physical therapy.

56. Mr. Matos advised Mrs. Flanzer that with physical therapy, a reasonable accommodation for his medical condition, he could continue performing his job duties.

57. Mrs. Flanzer was clearly displeased about, and resented, Mr. Matos's medical condition, his need for surgery, and his request for a reasonable accommodation.

58. Mrs. Flanzer's hostility was clear when Mr. Matos spoke with her on the phone.

59. Mrs. Flanzer perceived and regarded Mr. Matos as disabled.

60. On March 13, 2012, Mr. Matos reported to work.

61. On March 13, 2012, just one day after Mr. Matos spoke with Mrs. Flanzer, Defendants suddenly terminated Mr. Matos, alleging that his services were no longer required.

62. On March 13, 2012, Mr. Matos received a call from Eric Kaplan.

63. Upon information and belief, at that time Mr. Kaplan was President of Bristol Consultants LLC in New York City, managed certain of Mrs. Flanzer's finances, and was calling Mr. Matos from New York City.

64. Mr. Kaplan told Mr. Matos that he was calling on behalf of Mrs. Flanzer.

65. Mr. Kaplan told Mr. Matos that Mr. Matos was fired.

66. Mr. Matos asked Mr. Kaplan why his employment was being terminated.

67. Mr. Kaplan told Mr. Matos that Mrs. Flanzer was selling her Scarsdale home, not returning to New York, and no longer needed Mr. Matos's services.

68. On March 22, 2012, Mr. Matos underwent surgery.

69. On or about March 22, 2012, Defendants, by NY Cap Agency LLC, sent Mr. Matos a letter referencing his termination but providing no explanation for the discharge.

70. After Mr. Matos was unlawfully terminated, Mr. Matos called Mrs. Flanzer, then in Florida, and asked why Mr. Matos was being fired.

71. Mrs. Flanzer refused to respond.

72. Rather, Mrs. Flanzer told Mr. Matos not to use her name at the hospital when he goes for treatment, and hung up on him.

73. Defendants canceled Mr. Matos's health insurance and, therefore, after Mr. Matos underwent surgery, he could not afford prescribed physical therapy.

74. Defendants' stated reason for terminating Mr. Matos is false and a pretext for unlawful discrimination and discharge based on disability.

75. For example, at all relevant times, Mrs. Flanzer always had an employee performing for her the type of services that Mr. Matos provided during his employment.

76. For example, Mrs. Flanzer did not sell the Scarsdale Residence.

77. For example, Mr. Matos's position was not eliminated.

78. After Defendants discharged Mr. Matos, Defendants filled Mr. Matos's position with someone outside his protected class.

79. According to Defendants, on June 1, 2012, Defendants hired Mr. Dana Mahoney for the position.

80. Upon information and belief, Mr. Mahoney is outside Mr. Matos's protected class because he is not disabled under the law.

81. Defendants discharged Mr. Matos to replace him with a non-disabled employee.

82. Defendants' proffered reason for discharging Mr. Matos was false and a pretext for discrimination based on disability.

83. Defendants paid wages to Mr. Matos by checks issued by NY Cap Agency LLC.

84. In October 2012, Mr. Matos received a letter from NY Cap Agency LLC enclosing a check made payable to Mr. Matos by Ogden CAP Properties, LLC.

## MR. MATOS'S EEOC CHARGE

85. Mr. Matos timely filed an EEOC Charge.

86. NY Cap Agency LLC filed a position statement with EEOC.

87. The EEOC investigated the EEOC Charge.

88. The EEOC found discrimination.

89. On or about March 20, 2014, the EEOC issued a Determination in Mr. Matos's favor, stating, among other items, that:

> "Respondent's proffered reason for Charging Party's discharge is not supported by the record....the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on account of his disability."

90. The EEOC sought to initiate the conciliation process but, upon information and belief, Defendants failed and refused to participate in such a process.

91. Thereafter, the EEOC issued a Notice of Right To Sue, dated June 30, 2014, reiterating that the EEOC found discrimination in this matter, stating:

> "The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief to you."

**DEFENDANTS' CONDUCT IS UNLAWFUL**

92. Defendants unlawfully discharged Mr. Matos.

93. Mr. Matos was treated less well than other employees because of his disability.

94. Defendants knew or should have known of the unlawful discrimination.

95. Upon information and belief, Defendants condoned such unlawful conduct.

96. Defendants failed to exercise reasonable care to prevent and correct the discrimination.

97. Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled, supported, ratified, approved, condoned and/or coerced the unlawful conduct alleged herein.

98. Defendants' proffered reason for the conduct was a pretext for unlawful conduct and unlawful discrimination.

99. Defendants' unlawful conduct impacted Mr. Matos in New York City.

100. Defendants' conduct, as alleged herein, was perpetrated with malice or reckless indifference to Mr. Matos's rights to be free from discrimination.

101. As a result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer damages.

102. Plaintiff is entitled to recover such damages.

**COUNT ONE**

**(NYCHRL)**

103. Plaintiff repeats and realleges every allegation in paragraphs 1 through 102 of this Complaint with the same force and effect as though fully set forth herein.

104. This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq. and reference is made to the NYCHRL in its entirety and to N.Y.C. Admin. Code §§ 8-102, 8-102(1), 8-102(5), 8-107, 8-107(1), 8-107(1)(a), 8-107(6), and 8-502.

105. Under the NYCHRL, the term "disability" means any physical, medical or mental

or psychological impairment, or a history or record of such impairment. N.Y.C. Admin. Code § 8-102(16).

106. Under the NYCHRL, it is unlawful for an employer to discharge an employee because of the actual or perceived disability of such person. N.Y.C. Admin. Code § 8-107(1)(a).

107. Under the NYCHRL, it is unlawful for an employer to fail to make reasonable accommodation for an employee with a disability unless the employer proves that the employee could not, with reasonable accommodation, perform the essential requisites of the job. N.Y.C. Admin. Code § 8-107(15).

108. At all relevant times herein, Defendants were each an "employer," "covered entity" and a "person" within the meaning of the NYCHRL.

109. At all relevant times herein, Mr. Matos was a "person" and "employee" within the meaning of the NYCHRL.

110. Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination based on disability, unlawful discharge, unlawful retaliation, unlawful denial of a reasonable accommodation, and unlawful aiding and abetting thereof, in violation of the NYCHRL. Defendants treated Mr. Matos less well than other employees because of his disability.

111. Defendants are liable for the unlawful conduct herein both as an "employer" under NYCHRL § 8-107(1) and under the "aiding and abetting" provisions of NYCHRL § 8-107(6).

112. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Mr. Matos's protected rights to be free from discrimination.

113. As a result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer injury, with resulting monetary, economic and other damages, including without limitation, lost wages, lost back pay, lost front pay, lost benefits, lost interest and attorneys' fees and costs.

114. Plaintiff is entitled to recover such monetary and other damages, punitive

damages, interest, and attorneys' fees and costs from the Defendants.

115. As a further result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer, among other items, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.

116. Plaintiff is entitled to recover damages for such injuries from the Defendants.

**COUNT TWO**

**(ADA)**

117. Plaintiff repeats and realleges every allegation in paragraphs 1 through 116 of this Complaint with the same force and effect as though fully set forth herein.

118. This Count is brought under the ADA, as amended, 42 U.S.C. § 12101 et seq. and reference is made to the ADA in its entirety.

119. Under the ADA, the term "disability" means a physical or mental impairment that substantially limits one or more major life activities of such individual, a record of such an impairment, or being regarded as having such an impairment 42 U.S.C. § 12102(1).

120. Major life activities include, among other items, walking, standing, lifting, bending, and working. 42 U.S.C. § 12102(2).

121. Under the ADA, it is unlawful for an employer to discharge an employee because of the disability of such person. 42 U.S.C. § 12112.

122. Under the ADA, it is unlawful for an employer to fail to make reasonable accommodation for an employee with a disability unless the employer proves that such accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112.

123. At all relevant times, Mr. Matos was an "employee" and "person" within the meaning of the ADA.

124. At all relevant times, each Corporate Defendant was and is an "employer" and "covered entity" within the meaning of the ADA.

125. At all relevant times, Defendants were engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

126. Under the ADA, the term disability means, with respect to an individual: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

127. At all relevant times, Mr. Matos was a "qualified individual" with a disability within the meaning of the ADA because, among other items: (1) he had a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) he had a record of such an impairment; and/or (3) he was being regarded as having such an impairment. See, e.g., 42 U.S.C. § 12102.

128. Mr. Matos was entitled to a reasonable accommodation for his disability.

129. Defendants' conduct, as alleged herein, constituted unlawful employment practices, unlawful discrimination based on disability, unlawful discharge, unlawful retaliation, and unlawful denial of a reasonable accommodation, in violation of the ADA.

130. Defendants' unlawful conduct was intentional and was carried out with malice or reckless indifference to Mr. Matos's protected rights to be free from unlawful discrimination and retaliation.

131. As a result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation, lost wages/bonuses, lost benefits, pension monies and contributions, lost interest and attorneys' fees and costs.

132. Plaintiff is entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Corporate Defendants under the ADA.

133. As a further result of Defendants' unlawful conduct, Mr. Matos has suffered and

continues to suffer, among other items, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.

134. Plaintiff is entitled to recover damages for such injuries from the Corporate Defendants under the ADA.

## COUNT THREE

## (NYSHRL)

135. Plaintiff repeats and realleges every allegation in paragraphs 1 through 134 of this Complaint with the same force and effect as though fully set forth herein.

136. This Count is brought under the NYSHRL, N.Y. Exec. L. § 290 et seq. and reference is made to the NYSHRL in its entirety and to N.Y. Exec. L. §§ 292, 292(1), 292(5), 296, 296(1), 296(1)(a), 296(6), and 297(9).

137. Under the NYSHRL, the term "disability" includes (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment. N.Y. Exec. L. § 292(21).

138. Under the NYSHRL, it is unlawful for an employer to discharge an employee because of the disability of such person. N.Y. Exec. L § 296(1)(a).

139. Under the NYSHRL, it is unlawful for an employer to fail to make reasonable accommodation for an employee with a disability unless the employer proves that such accommodation would impose an undue hardship on the employer. N.Y Exec. L. §§ 292(21), (21–e).

140. At all relevant times, Defendants were each an "employer" within the meaning of the NYSHRL.

141. At all relevant times, Mr. Matos was an "employee" within the meaning of the

NYSHRL, and a "person" within the meaning of the NYSHRL.

142. Defendants' conduct, as alleged herein, constituted unlawful discriminatory and employment practices and unlawful discrimination based on disability, unlawful discharge, unlawful retaliation, unlawful denial of a reasonable accommodation, and unlawful aiding and abetting thereof, in violation of the NYSHRL.

143. Defendants are liable for the unlawful conduct herein both as an "employer" under NYSHRL § 296(1) and under the "aiding and abetting" provisions of NYSHRL § 296(6).

144. As a result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer injury, with resulting monetary, economic and other damages, including without limitation, lost wages, lost back pay, lost front pay, lost benefits, and lost interest.

145. Plaintiff is entitled to recover such monetary and other damages, and interest from the Defendants.

146. As a further result of Defendants' unlawful conduct, Mr. Matos has suffered and continues to suffer, among other items, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.

147. Plaintiff is entitled to recover damages for such injuries from the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment on all Counts, as follows:

(A) On Count One, enter a judgment declaring the acts and practices of Defendants to be in violation of the NYCHRL;

(B) On Count One, award Plaintiff as against Defendants the amount of wages, including without limitation back pay, front pay, benefits, and interest lost as a result of Defendants' unlawful conduct;

(C) On Count One, award Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful conduct;

(D) On Count One, award Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(E) On Count One, award Plaintiff as against Defendants punitive damages;

(F) On Count One, award Plaintiff as against Defendants the costs of this action, together with reasonable attorneys' fees;

(G) On Count Two, enter a judgment declaring the acts and practices of Corporate Defendants to be in violation of the ADA;

(H) On Count Two, award Plaintiff as against Corporate Defendants the amount of wages, including without limitation back pay, front pay, benefits, and interest lost as a result of Defendants' unlawful conduct;

(I) On Count Two, award Plaintiff as against Corporate Defendants consequential damages for losses resulting from Defendants' unlawful conduct;

(J) On Count Two, award Plaintiff as against Corporate Defendants compensatory damages for, among other items, injury, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(K) On Count Two, award Plaintiff as against Corporate Defendants punitive damages;

(L) On Count Two, award Plaintiff as against Corporate Defendants the costs of this action, together with reasonable attorneys' fees;

(M) On Count Three, enter a judgment declaring the acts and practices of Defendants to be in violation of the NYSHRL;

(N) On Count Three, award Plaintiff as against Defendants the amount of wages, including without limitation back pay, front pay, benefits, and interest lost as a result of Defendants' unlawful conduct;

(O) On Count Three, award Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful conduct;

(P) On Count Three, award Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to Mr. Matos's good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(Q) On All Counts, award Plaintiff any and all other damages and relief provided by the applicable statutes; and

(R) Grant Plaintiff such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial for all issues triable.

Dated: New York, New York
September 24, 2014

GOLDBERG & FLIEGEL LLP

By: Kenneth A. Goldberg
Kenneth A. Goldberg

60 East 42nd Street, Suite 3520
New York, New York 10165
(212) 983-1077

Attorneys for Plaintiff